# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:16-CR-00310 |
| v. | (Judge Brann) |
| EDWIN VAQUIZ, | |
| Defendant. | |

## MEMORANDUM OPINION

### JULY 12, 2018

Before the Court for disposition is Defendant Edwin Vaquiz's Motion to Suppress Evidence. For the following reasons, this motion will be denied.

## I. FACTUAL BACKGROUND[1]

This Motion seeks the suppression of 280 bags of heroin seized during a search incident to arrest on January 29, 2016. The crux of this motion is whether probable cause to arrest, and thus search, Edwin Vaquiz ("Mr. Vaquiz") was lacking because it was premised on information gleaned from an informant alleged to be both unreliable and otherwise suspect. The background of Mr. Vaquiz's arrest and the investigation leading thereto is as follows.

---

[1] This relevant factual narrative derives from testimonial and documentary evidence adduced during the May 30, 2018 suppression hearing in this matter, together with any exhibits attached to the parties' briefing. It reflects this Court's assessment of the credibility of the testimony provided. An official transcript of the suppression hearing has been filed. *See* 5/30/18 Hr'g Tr. (ECF No. 58). Citations thereto are abbreviated as "5/30/18 Hr'g Tr." Exhibits admitted during the suppression hearing are cited as "5/30/18 Hr'g Ex."

In January 2016, at the genesis of this case's investigation, confidential informant, J.F., was facing charges related to lying on a permit to purchase a firearm.[2] J.F.'s criminal history includes prior convictions for theft by deception and possession of narcotics.[3] In order to receive positive consideration in her case, J.F. sought to assist authorities by providing information concerning ongoing criminal activity.[4] Specifically, J.F. informed police that she knew a drug user named T.L., who could supply her with heroin.[5] T.L. was already known to Borough of Berwick Police, including testifying Officer Gregory Martin, as a "middle-man" for drug transactions, i.e. someone who facilitates a purchase of narcotics in exchange for a portion of the drugs obtained.[6] T.L. also had prior drug-related convictions.[7] Based on this information concerning T.L., detectives believed that J.F. would likely be able to obtain heroin from her, and thus lead investigators to a source of drug supply.[8] Furthermore, despite her prior criminal history, Detective Martin testified that he found J.F. to be credible.[9] He

---

[2] 5/30/18 Hr'g Tr. at 25:22–26:6.

[3] *See* ECF No. 47-1. *See also* 5/30/18 Hr'g Ex. 4 (Defendant).

[4] 5/30/18 Hr'g Tr. at 25:19–26:6 ("Brandon had come forward and stated that she was willing to make controlled purchases through an individual . . . "). *See also* 5/30/18 Hr'g Ex. 8 (Defendant).

[5] *Id.* at 25:19-21.

[6] *Id.* at 26:13-25.

[7] *Id.* at 27:1-19.

[8] *Id.*

[9] 5/30/18 Hr'g Tr. at 25: 5–18.

specifically noted that, over the course of 13 years and previous arrests, he had interviewed J.F. between 6 and 12 times.[10]

A controlled purchase by J.F. was therefore arranged for January 22, 2016. Participating in that operation were Berwick Police Department Officers Gregory Martin, Scott Sienkiewicz, and Brandon Schultz.[11] Prior to this purchase, the officers searched J.F's car and her person to confirm that she did not have money or contraband.[12] The officers also provided to her $80.00 to buy heroin.[13] J.F. was kept under constant surveillance throughout the events of the day, as the officers drove in two separate vehicles and maintained contact with each other using cellular telephones.[14]

First, J.F. met T.L. at her residence and gave her the $ 80.00 provided by the officers.[15] Riding in J.F.'s car, T.L. then directed J.F. to an alley parallel to Market Street in Berwick.[16] Both J.F. and the officers recognized the residence as belonging to Edwin Vaquiz.[17] The officers established multiple angles of sight to

---

[10] *Id.*

[11] *Id.* at 28: 11-13.

[12] *Id.* at 27: 24–28: 3; 109: 10-19.

[13] *Id. See also* 5/30/18 Hr'g Ex. 5 (Defendant).

[14] 5/30/18 Hr'g Tr. at 28:11–29:3.

[15] *Id.* at 111: 7–11.

[16] *Id.* at 28:20–29:12; 110:13-25.

[17] *Id.* Officers had previously arrested Mr. Vaquiz at this residence. *Id.* at 29: 4–6.

keep both T.L. and any drug transaction in view.[18] For instance, Detective Martin then saw Mr. Vaquiz exit the rear of his residence and proceed to his carport as T.L. exited the vehicle.[19] Detective Schultz came within 50 yards of Mr. Vaquiz and T.L., and observed their meeting personally.[20] Following this meeting, T.L. returned to the vehicle, and both she and J.F. drove back to T.L.'s residence.[21] After she dropped T.L. off at her residence, J.F. again met with the officers at the police station and handed over five packets of drugs stamped "Black Jack."[22] These packets later tested positive for heroin.[23] J.F. and her vehicle were again searched, and no money or additional contraband was found.[24] J.F. verbally confirmed to the officers what they had personally seen, i.e. that she gave the $80.00 to T.L., who left the vehicle to meet with Mr. Vaquiz and then returned and gave J.F. heroin.[25]

---

[18] *Id.* at 29:13–30:10.

[19] 5/30/18 Hr'g Tr. at 29:13–30:10.

[20] *Id.* at 30:20–32:13. At the suppression hearing, Defendant objected, on hearsay grounds, to the admission into evidence of Detective Schultz's statements to Detective Martin. *See* 5/30/18 Hr'g Tr. at 31: 7-12. However, "at a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *See United States v. Hubbard,* 269 F.Supp.2d 474, 479 (D.Del. 2003) (quoting *United States v. Raddatz,* 447 U.S. 667, 679 (1980)); *see also United States v. Gadsden,* 410 F. App'x 500, 505 (3d Cir. 2011).

[21] 5/30/18 Hr'g Tr. at 32:5-24.

[22] *Id.*

[23] *Id.* at 33:10-23; 5/30/18 Hr'g Ex. 1 (Government).

[24] 5/30/18 Hr'g Tr. at 32:18–33:3.

[25] *Id.* at 113:1-9; 35:1-7.

On January 28, 2016, J.F. informed officers that T.L. had told her that Mr. Vaquiz planned to travel to Philadelphia to obtain a new supply of heroin.[26] Officers formed a plan, and instructed J.F. to offer to drive Mr. Vaquiz to re-supply in exchange for heroin.[27] On the morning of January 29, 2016—the date planned for this trek to Philadelphia, the same three Berwick officers met with J.F., searched her and her vehicle, and provided her with funds to cover gas and expenses.[28] The officers thereafter followed J.F. as she drove first to pick up T.L., and then Mr. Vaquiz.[29] Now surveilling a car occupied by J.F., T.L., and Mr. Vaquiz, the officers followed the car to an A.T.M. where Mr. Vaquiz withdrew cash.[30] The vehicle then proceeded toward Route 80, and onto the Northeast Extension of the Pennsylvania Turnpike.[31] Agents followed the vehicle a majority of the way to Philadelphia before turning back toward Berwick.[32]

However, in Philadelphia, J.F. kept in contact with Detective Schultz via cellular telephone to let him know what was going on.[33] Detective Schultz instructed J.F. to send him a text message on the return trip when she was ten

---

[26] *Id.* at 36:11-20; 113:10–114:6.

[27] *Id.* at 36:21-37:1.

[28] *Id.* at 37:2-10. *See also* 5/30/18 Hr'g Ex. 6 (Defendant).

[29] 5/30/18 Hr'g Tr. at 37:11-24.

[30] *Id.*

[31] *Id.*

[32] *Id.* at 37:25–38:7.

[33] 5/30/18 Hr'g Tr. at 38:8-21; 117:1-4.

minutes away from Berwick, and to park at the gas station on Market Street in Berwick.[34] While in Philadelphia, J.F. testified that she witnessed Mr. Vaquiz meet with a supplier who provided him with both a large and small package.[35] As directed, J.F. texted Detective Schultz when they were ten minutes away from Berwick, and then, once in the borough, parked at the designated gas station and entered the store as instructed.[36]

At the Berwick gas station, the six officers and agents swarmed the vehicle with guns drawn, and removed Mr. Vaquiz and T.L. from the car.[37] Two officers then placed Mr. Vaquiz on the ground to apply handcuffs.[38] Officer Schultz thereafter conducted a search incident to arrest and seized a wrapped package containing 280 bags of suspected heroin, stamped "Transformers."[39] Officer Schultz located an additional 28 bags of heroin from beneath the back seat next to where Mr. Vaquiz was sitting.[40] Detective Martin testified that, when he and other officers arrested Vaquiz, they did so based on what they had observed first-hand, along with everything J.F. had told them, including that 1) Mr. Vaquiz had

---

[34] *Id.*

[35] *Id.* at 117:8–118:13.

[36] *Id.* at 40:4-5; 119:1-9; 120:1-4.

[37] *Id.* at 40:6–41:16.

[38] 5/30/18 Hr'g Tr. at 41:21-42:13.

[39] *Id.* at 42:1–43:11; 5/30/18 Hr'g Exs. 2–6 (Government).

[40] *Id.* at 120:15–121:23.

distributed heroin to T.L. on January 22; and 2) Mr. Vaquiz had obtained and was in possession of heroin at the time of his arrest.[41]

On October 25, 2016, Edwin Vaquiz was indicted by a grand jury sitting in the United States District Court for the Middle District of Pennsylvania with (1) distribution of a controlled substance in violation of 21 U.S.C. § 841(a)(1), and (2) possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).[42] A jury trial is scheduled in this matter for July 23, 2018.[43]

On April 27, 2018, Mr. Vaquiz filed a Motion to Suppress, asking this Court to suppress the 280 bags of heroin seized from his person during the January 29, 2016 arrest.[44] This Court held a hearing on this issue on May 30, 2018.[45] This motion has since been fully briefed, including post-hearing briefing, and is now ripe for disposition.[46]

## II. ANALYSIS

The instant motion asks that the Court suppress 280 bags of heroin seized from Defendant Mr. Vaquiz's person during a search incident to arrest on January 29, 2016. Mr. Vaquiz specifically argues that officers lacked probable cause to

---

[41] *Id.* at 43:12–44:9.
[42] ECF No. 1.
[43] ECF No. 46.
[44] ECF No. 47.
[45] ECF No. 58.
[46] ECF Nos. 48, 50, 83, & 84.

arrest him because they relied upon the unreliable and suspect information of informant, J.F. However, because the factual record demonstrates that J.F. proved her reliability on numerous occasions and that the information provided by her was often independently corroborated by the officers in this case, I disagree. My reasoning follows.

The Fourth Amendment protects individuals "against unreasonable searches and seizures."[47] The Supreme Court has held that a search "conducted outside the judicial process, without prior approval by a judge of magistrate, [is] per se unreasonable-subject only to a few specifically established and well-delineated exceptions."[48] In one such example, law enforcement officers do not need a warrant to arrest an individual in a public place if they have probable cause to believe that the person has committed or is committing a crime.[49] Probable cause for a warrantless arrest exists when, at the time of the arrest, the facts and circumstances known to the police are "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense."[50]

---

[47] U.S. Const. amend. IV.

[48] *Katz v. United States,* 389 U.S. 347, 357 (1967).

[49] *United States v. McGlory,* 968 F.2d 309, 342 (3d Cir. 1992) (citing *United States v. Watson,* 423 U.S. 411, 421 (1976)).

[50] *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also United States v. Meyers*, 308 F.3d 251, 255 (3d Cir. 2002).

Here, the parties dispute whether the facts known to the officers and agents on January 29, 2016 established probable cause that Mr. Vaquiz had committed or was committing a criminal offense. With knowledge drawn from the confidential informant J.F, the parties specifically disagree as to whether the officers effectuating Mr. Vaquiz's arrest improperly relied upon J.F.'s suspect and unreliable word. To the extent that such probable cause was lacking, any evidence seized in a search incident to that arrest[51]—here, 280 bags of heroin—would be suppressed as fruit of the poisonous tree.[52]

In *Illinois v. Gates*, the Supreme Court of the United States abandoned a separate, two-pronged test known as the *Aguilar-Spinelli* test concerning confidential informants in favor of the totality-of-the-circumstances approach general to the probable cause analysis.[53] The *Gates* Court held that, while an informant's "veracity" and "reliability" are still relevant to a probable cause analysis, "these elements should [not] be understood as entirely separate and

---

[51] "'Among the exceptions to the [Fourth Amendment's] warrant requirement is a search incident to a lawful arrest. The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations.'" *United States v. Matthews*, 532 F.App'x. 211, 217–18 (3d Cir. 2013)(quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)(internal citations omitted)). Under this exception, "police may search incident to arrest only the space within an arrestee's 'immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" *Id.* at 218 (citations omitted).

[52] *See Murray v. United States*, 487 U.S. 533, 536 (1988)("The exclusionary rule is a judicially-created remedy which "prohibits introduction into evidence of tangible materials seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search.").

[53] 462 U.S. 213, 230 (1983).

independent elements to be rigidly applied in every case."[54] Rather, "a deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia or reliability."[55] "In particular, *Gates* endorsed independent '[police] corroboration of details of an informant's tip' as an important method for establishing a tip's reliability."[56]

Defendant essentially argues that, because J.F. had prior convictions for *crimen falsi* offenses, probable cause, to the extent based on her word, was lacking. The Government responds that, despite these convictions, an independent factual basis confirmed the reliability of J.F.'s provided information and supported the officers' probable cause determination on January 29, 2016.

Having reviewed the factual record of this case as ably developed by counsel at the suppression hearing, I find that probable cause existed to arrest Mr. Vaquiz on January 29, 2016. First, I note that, despite the troubling criminal convictions of J.F., she was nevertheless known to Detective Martin over the course of his 13 years as a police officer as reliable and forthcoming.[57] Indeed, at the suppression hearing held in this matter, Detective Martin stated as follows:

---

[54] *Id.* at 230.

[55] *Id.*

[56] *United States v. Stearn*, 597 F.3d 540, 555 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 241).

[57] On a motion to suppress, the judge sits as the fact finder and is empowered to make any necessary credibility determinations. *See United States v. Harris,* 507 F.2d 197, 198 (3d

Q. Got it. So about [J.F.]; are you familiar with [J.F.]?

A. Yes, sir, I am.

Q. How are you familiar with her?

A. Within the first year or two of my career, responding to her house for normal patrol calls as well as a narcotics arrest that the narcotics officer at the time had facilitated purchases out of that house.

Q. So you have arrested [J.F.] in the past?

A. Yes.

Q. Have you ever interviewed her?

A. Yes.

Q. How many times?

A. Half a dozen to a dozen on certain things and spoken to her.

Q. Okay. So have you had occasion over that time, the half a dozen to a dozen times that you have interviewed her in your professional capacity or spoken to her in your professional capacity, have you formed any kind of judgment as to her credibility?

A. Yes. I have found her forthcoming with information when directly confronted with evidence. She would not offer up anything above and beyond that. But she would -- as we like to say, she would take credit for the things that she had done and own her misdeeds.

Q. To your knowledge, has [J.F.] ever lied to you over the course of that 13 years or so that you said you have known her?

---

Cir.1975) ("As a jury is at liberty to make findings of credibility without a reasoned explanation, so may a judge sitting as a fact finder."). Here, following the suppression hearing, the Court credits the testimony of Detective Martin at suppression hearing, which was largely corroborated by that of J.F.

A. No, sir.[58]

Moreover, despite Detective Martin's long standing knowledge of J.F. and his general belief that she was credible and forthcoming, the facts demonstrate that her word was not merely blindly followed. Rather, the record confirms that the officers assigned to this case independently corroborated the information supplied.[59] First, Detective Martin testified that, when J.F. indicated that she could buy heroin from "middle man" T.L. and thus lead them to a coveted supplier, that information was corroborated by the officers' own knowledge of T.L. Specifically, at the suppression hearing, Detective Martin testified that T.L. was well known as a "middle man," or someone who "obtained narcotics from dealers for users."[60] Therefore, given T.L.'s previous convictions for this same type of activity and the "regular" nature of drug activity in the area, Detective Martin and his colleagues found J.F.'s insistence that T.L. could lead her to a supplier to be credible.[61]

---

[58] 5/30/18 Hr'g Tr. at 24:15–25:18.

[59] Detective Martin testified at the suppression hearing that officers regularly "test the honesty" of confidential informants. He specifically stated that they do so by "searching them following a set set of procedures where we will search both the confidential informant, the confidential informant's vehicle. We'll limit the items that they will take with them, and then we will follow them using multiple officers, maintaining as close to constant surveillance on them as we can." 5/30/18 Hr'g Tr. at 21:3-18. This process is repeated following a controlled purchase.

[60] *Id.* at 27: 6–8.

[61] *Id.* at 26:7–27:12.

Prior to the controlled purchase of January 22, 2016, officers also searched both J.F. and her vehicle to confirm that they contained neither money nor contraband.[62] The officers thereafter followed J.F.'s vehicle at all times during this purchase and, most pertinently, to a residence known to them as belonging to Mr. Vaquiz.[63] Outside Mr. Vaquiz's residence, Detective Martin testified that he and his fellow officers set up a perimeter and viewed a transaction in which T.L. gave Mr. Vaquiz money in return for a substance later confirmed to be heroin.[64] Detective Martin specifically stated that he had known of Mr. Vaquiz over his fifteen years as a Berwick police officer[65] and saw him leave his home and walk towards the carport to meet T.L.[66] Detective Schultz, a mere 50 yards from the carport, corroborated that he saw Mr. Vaquiz and T.L. meet in the carport.[67]

Following T.L.'s return to the car, the officers followed J.F. as she dropped off T.L. and, at the police station, again searched her person and car. Other than heroin which she turned over to them labeled "Black Jack," officers found no additional contraband on her person or in her vehicle.[68] The Government argues

---

[62] *Id.* at 27:25-28:3. *See also* 5/30/18 Hr'g Ex. 2 (Defendant).

[63] *Id.* 28:20–29:12; 110:13-25.

[64] 5/30/18 Hr'g Tr. at 29:13-21.

[65] *Id.* at 29:10-12.

[66] *Id.* at 29:22–30:15.

[67] *Id.* at 30:22-25.

[68] *Id.* at 33: 1-3.

that probable cause to arrest Mr. Vaquiz on January 29, 2016 existed based on this controlled purchase of heroin alone. Indeed, courts have found that "a closely supervised and controlled purchase of narcotics establishes ample probable cause."[69] For example, and in the context of controlled purchases facilitated by a confidential informant, this Court has found probable cause to arrest where a detective coordinated three controlled buys from a Defendant, and each time "met with the informant, searched his person and vehicle for drugs, provided him with cash to buy the narcotics, observed him meet with Defendant, and established that the informant emerged from the transaction in possession of crack cocaine and without the vice funds."[70] The Court noted that "[t]he strength of this evidence, obtained through carefully-executed police procedure, trumps any alleged failings of the informant."[71]

Like the above case, police here had an additional basis for probable cause to arrest beyond the facts of January 22, 2016. Indeed, following the closely monitored controlled purchase of that date, J.F. again contacted officers to inform them that T.L. had told her that Mr. Vaquiz planned to travel to Philadelphia to obtain a new supply of heroin.[72] J.F. then drive both T.L. and Mr. Vaquiz to

---

[69] *United States v. Sanchez*, 246 F.App'x. 803, 805 (3d Cir. 2007)(non-precedential).

[70] *United States v. Kellam*, No. 14-cr-323, 2015 WL 6560637, at *5-6 (M.D.Pa. Oct. 29, 2015).

[71] *Id.*

[72] 5/30/18 Hr'g Tr. at 36:11-20; 113:10–114:6.

Philadelphia on January 29, 2016, but only after officers again searched J.F. and her vehicle for evidence of contraband.[73] As before, J.F. again closely followed the officers' directives during this trek. Indeed, Detective Martin testified that J.F. called them when she was alone. She was, at that moment, given very clear instructions to follow upon her return to Berwick:

> Q. Was she instructed on return to do anything in particular?
>
> A. Yes. She was instructed to stop at the – what's called the Fresh N Quik – it's a gas station on Market Street -- to get a pack of cigarettes.[74]

Furthermore, in accordance with instructions from Detective Schultz, J.F. sent a text message on the return trip when she was ten minutes from Berwick, and parked at the gas station on Market Street in Berwick.[75]

In sum, while cognizant of the credibility issues which J.F.'s prior convictions necessarily create, I do not find their existence *ipse dixit* sufficient to find a lack of probable cause. Corroborating the information provided by J.F. is the officers' past experience with both J.F. and T.L., their independent observations during the January 22, 2016 controlled purchase, and the physical evidence seized which resulted from this transaction. Furthermore, this pattern of demonstrating reliability through action was repeated a mere week later when J.F.

---

[73] *Id.* at 37:2-10.

[74] *Id.* at 39:17-20.

[75] *Id.* at 38:8-21; 40:4-5; 117:1-4; 119:1-9; 120:1-4.

again closely followed police directions during a planned drug run with Mr. Vaquiz. Cumulatively, the articulable facts known to the arresting officers at the time of Mr. Vaquiz's arrest, including the witnessed controlled purchase of January 22, 2016, are "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense" at the time of his arrest.[76] Therefore, while Mr. Vaquiz has implicated the credibility of both J.F. and Detective Schultz, I find that probable cause to arrest nevertheless existed on January 29, 2016.

## III. CONCLUSION

Based on the above analysis, Defendant Edwin Vaquiz's Motion to Suppress will be denied.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[76] *Sanchez*, 246 F.App'x. at 806; *United States v. Gallo,* 110 F. App'x 265, 268 (3d Cir. 2004)(non-precedential) (crediting a confidential informant by virtue of a successful controlled buy). *See also Kellam*, 2015 WL 6560637, at *6.